GENERAL ADJUSTMENT BUREAU,
INC., a New York corporation,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 14189.

United States Court of Appeals
Seventh Circuit.

Dec. 31, 1963.

Harold Stickler, Chicago, Ill., Philip C. Lederer, Chicago, Ill., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Harold B. Shore, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Melvin Pollack, Atty., N. L. R. B., Washington, D. C., for respondent.

Isaac N. Groner, Washington, D. C., for Insurance Workers International Union, AFL–CIO, amicus curiae.

Before SCHNACKENBERG, KILEY and SWYGERT, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

General Adjustment Bureau, Inc., a New York corporation, sometimes referred to herein as "the company", petitioner, asks us to review and set aside an order of the National Labor Relations Board that the company was guilty of unfair labor practices, under §§ 8(a) (1), 8(a) (3) and 8(a) (4) of the National Labor Relations Act as amended (U.

S.C. Title 29, Section 158(a) (1), (3) and (4)). By its order, the Board required the company to reinstate Larry Lefkowitz with full back pay from the date of termination of his employment, to cease and desist from conduct violating the statute and to post a notice that it intends to comply with said order.

In its answer to the petition, the Board has asked for enforcement of its order, which is reported at 142 NLRB No. 85. By leave of court, Insurance Workers International Union, AFL-CIO, has filed a brief as amicus curiae, in which it informs us that it was the charging party before the Board and participated in the proceedings there. The union asserts that we should compel enforcement of the Board's order.

Lefkowitz entered the employ of the company in April 1958. He was assigned to casualty claim adjustments in the 12th region, which was the metropolitan area of Pittsburgh, Pennsylvania. His superior was Walter H. Mason, a regional casualty supervisor, who was called as a witness for the Board. Lefkowitz had above average ability as an adjuster. Regional manager C. A. Eblin, also a Board witness, on one occasion recommended Lefkowitz for a special assignment in the New York office which involved about 1000 claimants.[1]

However, there was evidence that Mason, as Lefkowitz' superior, instructor and work leader, was constantly critical of Lefkowitz for failing to keep in touch with his office on a daily basis and especially for failing to make prompt initial contact with the claimants, insureds and insurance companies, or agents on new files assigned to him. These delays engendered numerous complaints from claimants, policyholders and company loss representatives and agents. When complaints were made to Lefkowitz, he refused to concede that criticism was at any time warranted. This attitude on his part produced further and more serious complaints, to a point where two major insurance companies refused to permit their cases to be handled by Lefkowitz. As a result, a substantial part of the work which normally would be assigned to him had to be parceled out among other adjusters.

In February 1961, Lefkowitz and another adjuster, Earl Bradley, began an organizing drive in behalf of the Insurance Workers of America, AFL-CIO. The union filed a representation petition with the Board in March and both Lefkowitz and Bradley testified in its behalf at a Board hearing on April 25.

On May 19, 1961, Mason, in a report prepared at Eblin's request, recommended Lefkowitz' transfer to a 1-man office or to an office in metropolitan New York.

On September 22, Mason, in a second report prepared at Eblin's request, again recommended Lefkowitz' transfer to a 1-man office. In this report, Mason said Lefkowitz had "demonstrated exceptional ability in the investigation and settlement of difficult claims"; that there had been no major complaints in the last few months about his work; and that his production record was "in keeping with the number of assignments received and the production record of the other men".

The union lost a representation election covering the adjusters, in October, 1961.

Lefkowitz became interested in running as a candidate for the legislature of Pennsylvania. In the summer of 1961, he mentioned this to branch manager John L. McCoy. According to Lefkowitz, letters were circulated by the "Lefkowitz for Legislature Committeee" on behalf of his candidacy, soliciting funds and working support as early as October and November 1961, and Eblin tacked one of the solicitation letters on the company bulletin board. Lefkowitz told no one except possibly his wife of any reservation in his mind against running. He was required to file his primary petition on or about March 12, 1962.

On November 17, 1961, Lefkowitz telephoned Mr. Whitelaw in the New York

---

1. Mason and Eblin were not in the employ of the company when they testified.

office, whom he considered in charge of his situation, and, according to Lefkowitz, he told Whitelaw that he had no alternative but to resign and protect his employment record. Whitelaw asked if Lefkowitz' files were in bad condition and Lefkowitz replied that he supposed they were by "ordinary" standards but not if the conditions under which he had been working were taken into consideration. Whitelaw asked Lefkowitz if he thought that he could do better work some place other than Pittsburgh but Lefkowitz preferred to remain in the area. Lefkowitz insisted that he told Whitelaw three times that his resignation was to take effect on March 1, 1962 and that, although Whitelaw tried to get him to move up the resignation date, he refused and Whitelaw thereupon accepted his resignation, but perhaps suggested that he put it in writing.

Asked whether Whitelaw then said anything to him to encourage him to resign, Lefkowitz testified:

"The only thing close he could have said would be to the effect that, 'Well, possibly it is best,' or some such language, but nothing, I don't think, any further than that."

On November 20, 1961, Lefkowitz appeared at the office of Eblin, with a draft of resignation addressed to Whitelaw. At his request Eblin caused his secretary to type the resignation letter. The letter was then mailed to Whitelaw in New York. It was addressed to Whitelaw, dated November 20, 1961, and reads:

"Dear Mr. Whitelaw:

"In keeping with our telephone conversation of November 17, 1961, I hereby tender by resignation, to be effective March 1, 1962.

"In the event of any Bureau exigency, I would willingly extend this for a period not to exceed thirty days (March 31, 1962).

"Most respectfully,
"Larry M. Lefkowitz"

According to Eblin, a Board witness, Lefkowitz, when he brought the draft of this letter in for typing, stated he could not accept any new assignments but would be willing to spend the time until March 1, 1962, or, if they wanted him until the end of March, bringing his files up-to-date or closing them if possible.

Upon reading the letter on November 22, 1961, Whitelaw noticed that it purported to be a resignation to take effect on March 1, 1962, which was 3 months and 10 days in the future. This came as a surprise to him. Thereupon Whitelaw telephoned to Lefkowitz in Pittsburgh and had his secretary make shorthand notes of "his end of the conversation", which were introduced in evidence and which the examiner found basically accurate. Whitelaw's remarks related to whether this resignation date had been mentioned in the previous telephone conversation of November 17, 1961; the reason for a resignation date over 3 months in the future and Lefkowitz' political plans; and the question as to whether a resignation taking effect so far in the future would be acceptable to the company. Lefkowitz stated that Whitelaw opened the conversation by asking whether a March 1st resignation date had been discussed in the previous conversation, and that he, Lefkowitz, replied that he had mentioned it three times. This was denied by Whitelaw.

In his direct testimony, Lefkowitz said he arrived at the March 1st date because it provided a three-month period, in which he thought that he could find suitable employment. However, on cross-examination he admitted that March 1st had been mentioned and that there was some conversation about formal procedure that he had to go through in running for the legislature, but not until March. In the phone call of November 22, 1961, Whitelaw asked Lefkowitz if in Pennsylvania he had "to get a petition".

On November 24th Whitelaw called Lefkowitz and they discussed what he had to do about the formal procedure for entering the primary, required in the State of Pennsylvania. In this conversation Lefkowitz said that he could not become a candidate before around March

12th and he would work off all of the files to the best of his ability by March 1st. He added:

"* * * I am not the type of man that merely because I am leaving March 1, that I would leave these files go in any manner, shape or form. I told him that I would work on the files and close as many as possible so that I wouldn't hand them over to another adjuster and another adjuster wouldn't have to inherit them."

To Whitelaw, Lefkowitz denied that he picked March 1 as the date for his resignation, so he could campaign for the legislature.

On November 27, 1961, Earl F. Leach, general manager, endorsed on the bottom of the Lefkowitz letter the words "Resignation Accepted" followed by his name and title. Thereupon, pursuant to his instructions, Leach's assistant, Kenneth G. Critton, met Lefkowitz on November 28, gave him a copy of the signed acceptance of Leach and relieved him of further duties. The examiner found that Critton agreed that Lefkowitz' pay would continue to March 1, 1962 but that he was to do no more work. He did no work for the company after November 28.

The record shows that approximately eleven days after the date he specified in his written resignation from the company, he actually did enter the Democratic primary for the legislature of Pennsylvania and waged a campaign. The primary election date was May 15, 1962. The charge made by the union to the Board on Lefkowitz' behalf, to the effect that his resignation in November, 1961, was not a voluntary resignation, was not filed until May 14, 1962, the day before the primary vote.

On cross-examination, Lefkowitz admitted that since November 1961 on many occasions he told persons that he had resigned voluntarily to enter politics. On redirect examination by Board counsel, he sought to justify the statements to prospective employers by stating, "I was job hunting at the time and you don't tell a prospective employer, I am afraid, that you are involved in union difficulty."

 1. There is no difficulty in determining that Lefkowitz *did* resign. The decisive question before us is whether the resignation of Lefkowitz was voluntary or coerced. The burden of pointing to proof that the resignation was in effect a "constructive discharge" rests upon the Board, which has raised that issue. We are not barred from setting aside the Board's decision, if we cannot conscientiously find that evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view. Universal Camera v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456.

2. In our necessarily curtailed recital of the facts leading up to the resignation, the essential elements thereof appear. For some period Lefkowitz' services were unsatisfactory, a fact which both he and his employer repeatedly recognized. The record is devoid of any suggestion by the company that he would be discharged or that he should resign, although some of the staff questioned his value to the company. Instead efforts were made to assist him, even to the extent of offering to transfer him to another district, which he rejected. While in some manner he had been engaged in an activity directed toward unionization of the company's employees, there is no evidence that he had ever been criticized or disciplined by the company in regard thereto or that this fact was even mentioned or considered. Our condensation of the evidence includes a reference to the company's recognition of his above average capabilities as an adjuster and its recommendation of him for a special assignment in the New York office. However, his shortcomings in the matters which we have related engendered complaints from insurance claimants, policy holders, and others with whom he came in contact in his work. Lefkowitz refused to admit the justice of any of these criticisms, resulting,

among other things, in the refusal of two insurance companies to permit their cases to be handled by Lefkowitz as an adjuster. The reassignment of this work to other adjusters necessarily disrupted the company's normal operations.

In the summer of 1961, the company attempted to remedy the situation when regional casualty manager Mason recommended that Lefkowitz transfer to a 1-man office or to an office in metropolitan New York. This recommendation was repeated in September when Mason said in substance that Lefkowitz' work had improved, and suggested that he be considered for transfer to an office in need of a single, experienced casualty adjuster where he would have the challenge of developing casualty business. However, at this time Lefkowitz considered becoming a candidate for election to membership in the Pennsylvania legislature and a committee in his behalf was soliciting funds for that purpose. The target date for filing his primary petition would be about March 12, 1962. Against this background he called Whitelaw in the New York office on November 17, 1961 and told him he had no alternative but to resign and "protect my employment record". He testified that he told Whitelaw three times that his resignation would take effect on March 1, 1962. On cross-examination, he was asked whether Whitelaw said anything to encourage him to resign and he answered that "the only thing close he could have said would be to the effect that, 'Well, possibly it is best', or some such language, but nothing, I don't think, further than that." The resignation followed on November 20, 1961. When Whitelaw called on November 24, Lefkowitz discussed with him the procedure required for entering the primary.

■ Was he forced to resign? If so, was it a forced resignation in which the man resigning was nevertheless able to specify the number of months before his resignation was to take effect? This hardly seems plausible. Or was it a voluntary resignation, which not only would protect his employment record but also provide him with a convenient transfer from his adjusting work to an entry into the field of politics? He admitted that on several occasions he stated to various persons that he had resigned voluntarily to enter politics. We think that on those occasions he told the truth. Strangely, the Board was willing to accept as true his assertion that he lied on all of those occasions. The Board gave its approval to the examiner's position, which she stated thus:

"I attach no significance to the fact that Lefkowitz told various people that he resigned to run for office. * * * "

We prefer not to adopt the illogical position taken by the Board, who would accept Lefkowitz as a martyr willing to confess deception of others to win the Board's decision. As to all of his testimony up to and including the acceptance of his resignation, the examiner, the trier of facts, was the judge of the veracity of Lefkowitz as a witness and we make no attack upon his veracity on that subject. However, since he was granted the privilege of characterizing as true or false his repeated assertions of his purpose in voluntarily resigning, we hold that we are not barred by the veracity rule from granting relief to prevent a miscarriage of justice.

■ On the record as a whole, we find there is not substantial evidence to support the Board's findings, upon which its order is based, because the record clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses. Universal Camera Corp. v. National Labor Relations Board, supra, 340 U.S. 490, 491, 71 S.Ct. 465, 466.

For these reasons, the Board's order is set aside and its enforcement is denied.

Order set aside and enforcement denied.

KILEY, Circuit Judge (dissenting).

Lefkowitz began working for the Bureau in April, 1958. In February, 1961, he and Bradley, another adjuster, started

an organizing drive in behalf of the Union. Both testified before the Board in support of a representative petition April 25, 1961. On May 19, Lefkowitz' regional manager recommended his transfer to a one-man office or to New York. About the first of June Bradley was discharged, and contemporaneously Lefkowitz' work was substantially doubled. In September his regional manager again recommended his transfer. In October Lefkowitz testified before the Board in support of a complaint alleging that Bradley was discharged for union activity. Later in October there was a conference in New York as a result of which Bureau officials Critton and Searles arrived in Pittsburgh November 15 and reviewed Lefkowitz' files. November 17 Lefkowitz was called in conference with Searles, Critton, and local officials. Late that day he called the Bureau's personnel manager in New York. November 20 he submitted his resignation effective March 1, 1962. Four days later his resignation was accepted, and he was told to turn in the company car and to cease work immediately. He was paid by the Bureau to March 1.

This skeleton of facts tells us nothing about the issue, which is whether Lefkowitz' resignation was a constructive discharge. There is no doubt that he was "cocky", with an exaggerated opinion of his importance. This is evidenced by his ambition to participate more fully in the Bureau's profit and affairs, by the terms of his resignation and by his offer in it to make himself available if needed by the Bureau for not to exceed thirty days after March 1 upon terms which he laid down. These characteristics did not result in his being separated from the Bureau. As indicated, he was presumed to be, with qualifications, a satisfactory employee.

Decision upon the issue rests on matters of credibility as to what really was the cause of, or what led to, the resignation. These were largely questions of credibility in the peculiar province of the trier of fact to choose between conflicting versions of what happened.

This court should not usurp the prerogative of the trier of fact to decide whom to believe. Because Lefkowitz made statements against his present interests, we are not to "think" that "on those occasions he told the truth," or to find it strange "that the Board was willing to accept as true" his testimony, at the trial, that the statements against present interest were not true. We should not be critical of the Board's, and the Trial Examiner's, attaching "no significance" to Lefkowitz' statements against interest, in view of his explanation that he feared telling the truth about his resignation would harm him. (And the Board was not required to pass moral judgment on Lefkowitz' lying.) The Board, not we, had the power to measure the credibility of Lefkowitz by comparing his statements against interest and his testimony at the trial.

Although there is a conflict in the evidence, after reviewing the record as a whole, I see no reason to upset the findings of fact made by the Board and the Trial Examiner. It is my opinion that the Board could reasonably infer that Lefkowitz' trouble with the Bureau stemmed from his union activity, that the Bureau officials, in the Pittsburgh area and in New York, cooperated to render Lefkowitz' relationship, knowing his characteristics, unbearable so that he would do exactly as he did. The Board was not required to draw the contrary inference that the majority opinion has drawn.

The Board's inferences are borne out by testimony that Lefkowitz' superior, early in November, 1961, approved his political ambition; that he was a young married man with little income other than his salary; that the primary political campaign was in May, 1962; that Lefkowitz objected to the idea of paying his salary with no work until March 1; and that Lefkowitz offered to work until April 1 if needed. There is testimony too that New York officials were sent to Pittsburgh with information that the

Bureau was having "considerable trouble" with union activities, with Lefkowitz one of the leaders; that instructions were given to Lefkowitz' superior to find "something wrong" with his files; that the officers from New York after reviewing the files found them "deplorable", far below Bureau standards, and impliedly threatened discharge; and that the personnel manager in New York thereafter asked Lefkowitz, when discussing his resignation, whether Lefkowitz thought he might do better work in some area other than Pittsburgh.

In my opinion, the record as a whole supports the Board's conclusion that the General Counsel had sustained his burden of proving the unfair labor practice alleged.